**Docket No: 23-2419**
**UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

NEW JERSEY STAFFING ALLIANCE,
AMERICAN STAFFING ASSOCIATION; NEW
JERSEY BUSINESS & INDUSTRY
ASSOCIATION,

          Appellants,

v.

CARI FAIS, Acting Director of the New Jersey
Division of Consumer Affairs in the Department of
Law and Public Safety; STATE OF NEW JERSEY;
ROBERT ASARO-ANGELO, Commissioner of
Labor and Workforce Development; NEW JERSEY
DIVISION OF CONSUMER AFFAIRS IN THE
DEPARTMENT OF LAW AND PUBLIC SAFETY;
NEW JERSEY DEPARTMENT OF LABOR AND
WORKFORCE DEVELOPMENT,

          Appellees.

**MOTION FOR
INJUNCTION AND STAY
PENDING APPEAL**

**TO:**

Patricia S. Dodszuweit, Clerk
United States Court of Appeals
For The Third Circuit

Nathaniel Levy, Esq.
Nathaniel.Levy@njoag.gov

Angela Cai, Deputy Solicitor General
angela.cai@njoag.gov

Jessica L. Palmer, Esq.
Jessica.palmer@law.njoag.gov

Eve Weissman, Esq.
Eve.Weissman@law.njag.gov

## PRELIMINARY STATEMENT

This Court should enjoin the operation and Defendants' enforcement of the Temporary Workers' Bill of Rights, N.J.S.A. 34:8D-1 *et seq.,* (the "Act") pending the Court's consideration of this appeal. The District Court held that Plaintiffs have established the irreparable harm likely to follow implementation of the Act. The District Court reached erroneous legal conclusions, however, regarding, <u>inter alia,</u> violations of the Dormant Commerce Clause and the Due Process Clause by the Act. The District Court's factual findings and legal conclusions in denying Plaintiffs' preliminary injunction application incorrectly characterized the salient provisions and the significant interpretive and enforcement problems of the Act, leading to mass confusion in the temporary staffing industry and arbitrary enforcement.

The District Court, among other things, erroneously concluded the Act was not a pricing discrimination statute violating the Dormant Commerce Clause. New Jersey has effectively imposed upon out of state companies a temporary worker minimum wage for workers coming from New Jersey. This is unconstitutional price setting, adversely impacting interstate commerce. The requirements of the Act prevent out of state companies from negotiating lower wages when utilizing New Jersey temporary staffing companies.

The District Court also erred by failing to conclude that the Act was unconstitutionally vague as to the pay and benefits provisions. The Act provides no definitions explaining how the industry may make calculations. The Defendants'

1

recently announced proposed regulations likewise do not answer fundamental questions and, indeed, reinforce the conclusion that the Act is vague in material respects. The regulations raise even more questions about how to calculate pay, benefits, their cash equivalent and identifying comparator employees. An entire industry is at risk of arbitrary enforcement of these vague provisions.

While the District Court did not reach the injunction factors addressing the public interest and potential harm to other interested parties, the record supports an injunction here. Enjoining the Act and its enforcement will serve the public interest by preventing enormous disruption and chaos within the industry and, likely, will prevent the decimation of companies and the associated employment of thousands of temporary staffing workers whose rights the Act was meant to enhance. An injunction pending appeal should be granted in the public interest.

## **PROCEDURAL HISTORY**

Plaintiffs-Appellants are associations whose members include entities which provide temporary employees to their third-party clients. Plaintiffs-Appellants move before the Court for an injunction and stay pending appeal pursuant to Rule 8(a)(2) of the Federal Rules of Appellate Procedure. Plaintiff made the motion in the District Court, which was denied.

On February 6, 2023, New Jersey enacted the "Temporary Workers' Bill of Rights", N.J.S.A. 34:8D-1 et seq. ("the Act"). While some parts of the Act went into

effect on May 7, 2023, other sections of the Act went into effect on August 5, 2023.

These provisions include N.J.S.A.:34:8D-7(b), with which Plaintiffs are most

concerned, imposing requirements upon Plaintiffs' members and their clients for the

amount of wages to be paid to temporary employees.

On May 5, 2023, Plaintiffs filed a complaint challenging the constitutionality of

the Act, alleging, inter alia, that it was so vague that Plaintiffs, and their customers, did

not know how to comply with it, and that it violated the Dormant Commerce Clause.

[ECF 1, pp. 18-20]. By way of an order to show cause entered on May 8, 2023 [ECF

1-6], Plaintiffs sought temporary and preliminary injunctive relief. The District Court

heard oral argument on June 13, 2023, and entertained supplemental written

submissions.

The District Court issued a written opinion and order on July 26, 2023 [ECF 34,

35], denying Plaintiffs' application for injunctive relief. Though the District Court

found the Plaintiffs had sufficiently established irreparable harm, the Court found they

had not established probability of success on the merits [ECF 34, pp. 10, 15-16].

Plaintiffs filed a notice of appeal on August 3, 2023 [ECF 38]. On August 11,

2023, Plaintiffs filed a motion in the District Court pursuant to Rule 8(a)(1)(A) and (C)

of the Federal Rules of Appellate Procedure and Rule 62 of the Federal Rules of Civil

Procedure for an injunction and stay pending appeal [ECF 39]. That motion was denied

by an Order and Opinion dated August 14, 2023 [ECF 40].

**STATEMENT OF FACTS**

The complaint filed by Plaintiffs seeks a declaration of unconstitutionality and a permanent injunction prohibiting enforcement of the Act, which Act purports to protect the labor rights of temporary workers. The Act was enacted on February 6, 2023, with certain provisions becoming effective on May 7, 2023 (N.J.S.A. 34:SD-3,-10) and others taking effect on August 5, 2023 (N.J.S.A. 34:8D-1, -2, -4 to -09, -11 to -13). Barring the relief sought from this Court, the complaint asserts the temporary staffing industry in the State of New Jersey is at risk of failure. Such an economic result would paradoxically harm the very workers the Act seeks to help.

Plaintiffs, New Jersey Staffing Alliance, New Jersey Business and Industry Association and the American Staffing Association, are organizations dedicated, respectively, to promote the staffing industry and its members, together with the promotion of New Jersey businesses [ECF 1-5].[1]   Defendants include the Commissioner of Labor and Workforce Development, and the Acting Director of the Division of Consumer Affairs in the Department of Law and Public Safety, the public officials charged with implementing and enforcing the Act.

The complaint asserts that the Act violates the United States Constitution provisions including, but not limited to, the Dormant Commerce Clause, and the

---

[1] Defendants, though originally challenging Plaintiffs' standing, later conceded that Plaintiffs have associational standing. [ECF 34, p. 10 fn. 9].

Due Process clause of the Fourteenth Amendment (due to vagueness and unlawful exercise of police power) [ECF 1, pp. 18-20].

Plaintiffs, among other things, are particularly concerned about Section 7(b) of the Act, which provides:

> Any temporary laborer assigned to work at a third-party client in a designated classification placement shall not be paid less than the average rate of pay and average cost of benefits, or the cash equivalent thereof, of employees of the third-party client performing the same or substantially similar work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions for the third-party client at the time the temporary laborer is assigned to work at the third-party client. Each violation of this subsection for each affected temporary laborer shall constitute a separate violation under section 11 of P.L. 2023, c.10 (C.34:8D-11).

Section (c) imposes a $5,000 civil penalty for violation of Section 7. Subsection (d) makes the third-party client jointly and severally liable for the violation.

Without the assistance of temporary staffing companies and the laborers they provide, many third-party clients (particularly small ones), cannot economically compete in the marketplace. Temporary staffing companies have responsibility for addressing all administrative matters, such as paying the workers' wages, obtaining and maintaining appropriate Workers' Compensation Insurance, attending to unemployment insurance obligations, performing payroll services, and withholding and paying all applicable taxes. [ECF 1-3, ¶9,10].

The third-party client determines the workers' daily work hours and their specific job duties. Temporary staffing companies charge third-party clients for their services by submitting an invoice. The invoice covers the staffing companies' costs of finding, recruiting and vetting the employees, in addition to taking care of all employer obligations such as paying the employees' wages and related taxes, providing workers' compensation and unemployment insurance, the general and administrative expenses of operating its business, plus a profit element. [ECF 1-3, ¶9-12].

Third-party clients are willing to pay the staffing companies in return for the flexibility of obtaining labor only as needed and to avoid the administrative burden of recruiting and hiring workers to their own payroll when the worker may be employed on a project for only a few days. [ECF 1-5, ¶13-16].

Section 7(b) of the Act, quoted above, will decimate the temporary staffing industry in New Jersey. First, this provision requires and assumes significant cooperation to be voluntarily provided by the third-party client, and this provision assumes that the third-party client is willing to share its pay scale information with the temporary staffing agency. Those assumptions are not accurate. [ECF 19-3, ¶5; 19-2, ¶2; 19-4, ¶3; ECF 23-4, ¶3; ECF 1-3, ¶24; 1-4, ¶23].

Second, the Act creates an arbitrary scheme for determining whether work is the same or substantially similar to the work performed by the employees of the third-party client. To enable temporary service firms to make such a determination,

there must be specific criteria for assessing whether the temporary job requires "equal skill, effort, and responsibility" as the job being performed by the client's employee and whether the job is "performed under similar working conditions." Such determinations are inherently subjective.

The Act lists three characteristics of temporary laborers necessary for pay calculations: skill, effort and responsibility. The Act provides no definitions for these critical terms, nor does it explain how each of these factors is to be evaluated or weighted. In other words, it becomes a subjective analysis on how to mix and match the various factors when comparing laborers. It is an impossible task to interpret and to implement the Act's pay provisions. Temporary service providers and third-party clients face enormous financial risk to run afoul of these vague and impossible provisions.

Third, the benefits calculations likewise are impossible to interpret. Calculating a "cash equivalent" for benefits is also unexplained. There is also no consideration for pay and benefits based on length of service. There can be some long-term assignments which are often the result of a mutual decision by both the individual and the third-party client. With long-term assignments both the staffing firm and the third-party client generally will agree to issue pay rate increases periodically to these temporary laborers to encourage retention of this temporary laborer. There is no accountability for this scenario in this Act.

Fourth, the Act requires the temporary worker to be paid the same average

pay plus benefits of a comparator third-party client employee. There is no clear definition regarding what is meant by "benefits provided to the clients' employees". There is no direction to advise if benefits include voluntary benefit plans as well as benefit plans whose costs are shared by the third-party client's employee and the third-party client. Also, the Act does not provide for any factors to determine whether a job is the same or substantially similar and factors that would allow pay and benefits differentials based on differing working conditions. For example, there is no consideration for factors such as seniority, merit, quantity or quality of production, workplace location, travel, education, training, and experience. There is likewise, no consideration for whether the work is performed on weekends, holidays or what time of day.

On July 21, 2023, the Department of Labor and Workforce Development issued a Notice of Proposed Rule Making purporting to clarify the Act, including Section 7(b)  (The Notice can be found at:

NJAC_12_72_(temporary_laborers)_(notice_of_proposal)_FILED_7_21_23.pd f). But as will be discussed *infra*, the proposed rules do not cure the Act's infirmities.

## POINT I

### THE STANDARD FOR A STAY PENDING APPEAL AND STANDARD OF REVIEW.

Plaintiffs submit that they meet the standard for an injunction and stay pending appeal.  "[T]he standard for obtaining a stay pending appeal is essentially the same as

that for obtaining a preliminary injunction." <u>H.R. Staffing Consultants v.</u> Butts, 2015

U.S. Dist. LEXIS 73194; 2015 WL 3561618 (D.N.J. McNulty, U.S.D.J.) (quoting

<u>Conestoga Wood Specialties Corp. v. Secretary of U.S. Dept. of Health and Human</u>

<u>Services,</u> 213 U.S. App. LEXIS 2706, 2013 WL 1277419 at *1 [3d Cir. Feb. 8, 2013]).

A stay pending appeal is governed by four equitable factors.

> (1) whether the stay applicant has made a strong showing
> that he is likely to succeed on the merits; (2) whether the
> applicant will be irreparably injured absent a stay; (3)
> whether issuance of the stay will substantially injure the
> other parties interested in the proceeding; and (4) where the
> public interest lies.

<u>Nken v. Holder,</u> 556 U.S. 418, 434 (2009) (quoting <u>Hilton v. Braunskill</u>, 481 U.S. 770,

776 (1998); <u>Kos Pharms., Inc. v. Andrx Corp.,</u> 369 F.3d 700, 708 (3d Cir. 2004).

While Plaintiffs acknowledge a stay pending appeal is extraordinary relief not

routinely granted, here such a stay is needed to preserve the *status quo*, particularly

since the District Court found that Plaintiffs will be irreparably injured. The District's

Court's finding that Plaintiffs would likely suffer irreparable harm upon

implementation of the Act tilts the scale toward granting this preliminary injunctive

relief. Indeed, the Third Circuit has stated, "in a situation where factors of irreparable

harm, interests of third parties and public considerations strongly favor the moving

party, an injunction might be appropriate even though plaintiffs did not demonstrate as

strong a likelihood of ultimate success as would generally be required." <u>Revel AC, Inc.</u>

v. IDEA Boardwalk LLC, 802 F.3d 558, 569-70 (3d Cir. 2015) (citing Constructors Ass'n of W. Pa. v. Kreps, 573 F.2d 811, 815 (3d Cir. 1978)).

Findings of fact are reviewed for clear error, legal conclusions are reviewed *de novo*, and the ultimate decision whether to grant or deny the injunction is reviewed for abuse of discretion. K.A. v. Pocono Mountain School District, 710 F.3d 99, (3d Cir. 2013); Sypniewski v. Warren Hills Reg'l Bd. of Educ., 307 F.3d 243, 252 (3d Cir. 2002). Under these standards, the two bases that are likely to succeed on the merits before this Circuit are the unconstitutional vagueness of the pay and benefits provisions of Section 7b of the Act, and the Act's violations of the Dormant Commerce Clause.

## POINT II

### PLAINTIFFS HAVE ESTABLISHED THE PREREQUISITES FOR INJUNCTIVE RELIEF.

**A.    Plaintiffs Established and The District Court Found That Plaintiffs Are Irreparably Harmed By The Act.**

Plaintiffs filed twelve Declarations establishing the real economic harm being caused to members of the staffing industry. This led the District Court to conclude that Plaintiffs had established the irreparable harm requirement.

The record supporting this finding is compelling. [ECF 1-3, 1-4, 1-5, 1-6; ECF 19-1 through 19-6; ECF 23-2 through 23-6]. Because of the relevance of the Dormant Commerce Clause issue, Plaintiffs highlight one such Declaration.

The Declaration of David Hayes, plant manager of Rogers Foam Corporation, located in Pennsylvania, highlights the burden on interstate commerce. [ECF 19-3]. His

company had hired temporary employees from New Jersey temporary staffing companies, but will no longer do so. He stated the Act will decimate the temporary staffing business in New Jersey. [ECF 19-3, ¶7]. New Jersey staffing companies will be ignored for further work. He explained that the Act results in overpayment of wages to temporary employees and that if he hired and paid temporary employees in accordance with the Act, he would not be able to retain permanent employees. [ECF 19-3, ¶2-5]. Hayes also indicates they cannot negotiate for Pennsylvania-based temporary workers while forced to disclose pricing information to third-party staffing companies from New Jersey. [ECF 19-3, ¶5].

The District Court found, based upon the Declarations, the likelihood that at least some subset of Plaintiffs' members will be forced out of business if the Act goes into effect.

The District Court recognized that, while economic loss alone will ordinarily be insufficient to establish irreparable harm, economic loss is sufficient to establish irreparable harm where the loss is not recoverable, or the loss is so substantial that it threatens the existence of a business, citing Minard Run Oil Co. v. U.S. Forrest Service, 670 F.3rd 236, 255 (3rd Cir. 2011). [ECF 34, p. 11-12]. The District Court found:

> Statements taken from this leader and others demonstrate the
> likelihood that at least some subset of Plaintiffs' members will be
> forced out of business if the Act goes into effect.
> [ECF 34, p.12].

The District Court found that the Act threatened Plaintiffs' members' existence, and that their economic loss was not recoverable against the Defendants as a result of the immunity under the Eleventh Amendment. Id.

The District Court correctly concluded that Plaintiffs are irreparably harmed by the Act.

**B.      Plaintiffs Have Established a Likelihood Success on Their Claim That The Pay Provisions of N.J.S.A. 34:8D-7(b) Violate the Dormant Commerce Clause.**

In reaching the conclusion that Plaintiffs had not established the likelihood of success with regard to their claim that Section 7(b) violated the Dormant Commerce Clause, the District Court relied heavily on the recent Supreme Court decision in National Pork Producers Council v. Ross, __ U.S. __, 143 S.Ct. 1142 (2023). The District Court's analysis and application of that decision, however, missed the mark resulting in the incorrect decision that Plaintiffs could not show a likelihood of success on the merits.

In National Pork, an association of pork producers challenged Proposition 12, adopted by California voters, which directed how pork sold in California would be produced, even if produced out of state.  Only a small percentage of pork sold in California was farmed there, and since an out of state pork grower or processor would have no idea whether pork product grown or processed would end up in California, the out of state grower or processor would have to comply with the California law with regard to all pork, or not sell its product in California.

National Pork did not involve discrimination against interstate commerce or protectionism, and is different from the instant case because it involved product originating out of state but sold in state. This case, insofar as the interstate commerce issue is concerned, involves a product (labor) originating in state and sold out of state. This difference is material because Justice Gorsuch, who authored the opinion cited by the District Court, relied heavily upon a state's traditional ability to regulate product sold within its borders, not the inverse where product from within the state is sold out-of-state.

It is respectfully submitted that the District Court did not correctly apply National Pork. The District Court stated:

> However, the National Pork court has rendered the "exterritoriality doctrine" a dead letter; extraterritorial effects alone are no longer sufficient to show a violation of the Commerce Clause…. Instead Plaintiffs now must demonstrate that a law amounts to "purposeful discrimination against out-of-state commerce".
> [ECF 34, p. 17].

While these statements are certainly consistent with a portion Justice Gorsuch's opinion, they fail to recognize that even under Justice Gorsuch's opinion, the Act violates the Dormant Commerce Clause because the Act is a pricing discrimination statute; it prevents out-of-state third-party clients from negotiating lower wages when it comes to the use of New Jersey staffing companies. Thus, this case is akin to the price of setting or price affirming cases, Healy v. Beer Institute, 491 U.S. 324 (1989), Brown-Forman Distillers Corp. v. New York Statute Liquor Auth., 476 U.S. 573 (1989), and

Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511 (1935), which Justice Gorsuch *distinguished* from the facts in National Pork. Justice Gorsuch noted that in Baldwin, the "challenged laws deliberately robbed out-of-state dairy farmers of the opportunity to charge lower prices in New York ...". Ibid. Here, the Law deprives out-of-state clients of the opportunity to pay less for New Jersey temporary staffing. The same analysis applies with respect to the price affirmation enactments in Healy and Brown-Forman.

With respect to the above trilogy of cases, Justice Gorsuch further stated, "throughout, the Court explained that the challenged statutes had a *specific* impermissible 'extraterritorial effect' they deliberately 'prevent[ed] out-of-state firms] from undertaking competitive pricing' or 'deprive[d] businesses and consumers in other states of 'whatever competitive advantage they may possess.'" Id. on 1155 (italics in original). So too with the Act.

There can be no doubt as to the impact on out-of-state entities, the Department has made clear in both its the Notice of Proposed Regulations issued by the Department[2] and its current guidance that:

> when the temporary laborer employed by a temporary help service firm that is located, operates, or transacts business within New Jersey is assigned to work in a designated classification placement **outside of New Jersey**, the temporary laborer is entitled to the rights and protections enumerated in the law only if the temporary laborer's primary residence is in New Jersey.

---

[2] The Notice of Proposed Regulations can be found at:

NJAC_12_72_(temporary_laborers)_(notice_of_proposal)_FILED_7_21_23.pdf)

New Jersey Department of Labor and Workforce Development, "Temporary Workers in NJ: Rights and Protections Frequently Asked Questions." *available at* https://www.nj.gov/labor/worker-rotections/myworkrights/temporaryworkers.shtml (accessed August 10, 2023 7:38 p.m.).

Thus, a company located in Pennsylvania or Delaware, utilizing temporary workers whose primary residence is New Jersey have now become subject to compliance with the Act, including the Act's price setting requirements. This most clearly runs afoul of the Supreme Court precedent cited above.

Further, and significant to ascertaining the scope of the plurality decision, Justice Gorsuch found that the petitioners in National Pork had not sufficiently pled substantial harm to interstate commerce, which he found was "nothing more than a speculative possibility". This is another way in which National Pork is distinguishable from the instant case. Plaintiffs submitted the Declaration of David Hayes, a Pennsylvania customer of a New Jersey temporary staffing provides, establishing the adverse impact on interstate commerce.

It is clear that the plurality opinion of the Court in National Pork was very narrow; the Plaintiffs' pleading in that case was inadequate. It is equally clear that a majority of Justices held that *discrimination* against interstate commerce is not an *absolute necessity* for a Dormant Commerce Clause violation. Based upon the clear application of the Act in the instant case to out of state entities and its price-setting

15

impacts, Plaintiffs here have made the necessary showing of a likelihood of success on

the merits.

**C.   Plaintiffs Established That They Will Likely Succeed in Their Claim That The Law Is Unconstitutionally Vague.**

As recognized by the District Court, a law is unconstitutionally vague under the

Due Process Clause only if it "'fails to provide a person of ordinary intelligence fair

notice of what is prohibited, or is so *standardless that it authorizes or encourages*

*seriously discriminatory enforcement.*"' United States v. Williams, 553 U.S. 285, 304

(2008) [ECF No. 34 at p. 22] (emphasis added).   Plaintiffs submit that they are

reasonably likely to succeed on appeal on this issue because Section 7b of the Act is so

standardless that the ultimate result will be discriminatory enforcement.

In rejecting Plaintiffs' vagueness argument, the District Court stated that the

factors raised by Plaintiffs, "have given away the game; they are tacitly admitting that

they know *exactly* the sort of relevant factors that ought to be considered in identifying

a proper comparator-employee for the calculation of pay and benefits under the Act."

[ECF No. 34 at p. 23]. Plaintiffs respectfully disagree with that legal conclusion because

it is, in fact, those infinite number of potential factors that results in a standardless

measure from which the New Jersey Department of Labor and Workforce Development

(hereinafter the "Department") can pick and choose for enforcement.

The facts are that there are innumerable potential benefits plans, and how those

plans can be converted to a "cash equivalent" is not explained, by the Act or  proposed

regulations. Regarding the value of benefits, the Act provides no guidance with regard to voluntary benefit plans or plans whose costs are shared by the employee and client. Each of the thousands of potential benefits plans might have a different answer as to what they use to define benefits packages, which is relevant to this determination.

It is also well known that medical plans, 401(k) plans and pension plans all have waiting periods, and it is entirely unclear how to account for an employee not receiving that benefit from the third-party client as opposed to those who are. There is no explanation on how to treat individuals who decline employer benefits since they receive coverage from either the State Marketplace, Medicare, Medicaid, or Veterans programs. Vesting schedules, profit plans and employer contributions depending on the length of time in the plan are obviously relevant but nowhere addressed. Plus, calculations are entirely different based upon whether a comparator employee is enrolled or not enrolled in employer-paid benefits. None of these questions are answered in Section 7b of the Act, or in the Proposed Regulations.

It is simply impossible to prepare a formula for determining the cost of benefits for medical, 401(k) and pension plans across all such clients and employees. The Department, therefore, has been given *carte blanch*e to decide one calculation is "correct" and the other "wrong" solely based on a whim.

The District Court's Opinion completely fails to address Plaintiffs' vagueness argument as it relates to the calculation of the cost of benefits.

The District Court's Opinion discussing Section 7b's pay provisions and benefit calculations, as well as the Act, do not in fact, address or explain how to determine whether "a permanent employee of the third party client is performing the same or substantially similar work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions" as the temporary worker. This is the critical element to determine whether the aforementioned pay and benefit calculations must occur in order to create pay equity.

While the District Court's decision referencing certain factors (e.g. merit, quality, quantity, workplace, training or experience), may be relevant, they are not dispositive, as demonstrated by the Department's Proposed Notice of Regulations which impart twelve "principles" to make such a determination. Regulations, however, are not principles; they have the force of law. See In re Waterfront Dev. Permit NO. WD88-0443-1, Lincoln Harbor Final Dev., Weehawken, Hudson Cty., 244 N.J. Super. 426, 433-34 (App. Div. 1990), certif. denied. 126 N.J. 320 (1991). A review of those "principles" shows that even the Department is unsure how to determine whether a permanent employee is performing work of equal skill, effort, and responsibility, and under similar working conditions as the temporary worker. One need only compare Proposed Regulations at N.J.A.C. 12:72-7.3(a)10 which states that "the number of years of service (i.e., seniority) of a particular employee is not relevant to the determination of whether two jobs are substantially similar" with the Proposed Regulation at N.J.A.C.

12:72-7.3(a)7, requiring skill be measured upon "factors such as the experience, ability, education and training required to perform a job." These two principles cannot coexist with one another.

The District Court's Opinion noted that Plaintiffs may provide comments to clarify the regulation before they are finalized and promulgated. This does not and cannot provide the necessary answers to these undefined and unexplained provisions. Plaintiffs are also not mollified by Defendants' representation that, "until the final adoption of the proposed regulations, they will not interpret nor enforce Section 7 in a contrary manner." [ECF 34 at p. 23-24]. The meaning of "contrary" is unclear, in comparison to an unknown definition.

Indeed, the District Court commented:

> Defendants' unwillingness to consider even a brief non-enforcement agreement, particularly as it relates to the pay provision, during the notice-and-comment period for their recently proposed regulations-issued on the eve of the Act taking effect – so that all involved parties and stakeholders could fairly assess and plan for the Act's implementation is disappointing given the tremendous changes that are about to occur.
> [ECF 34 at p. 15, fn 10].

Plaintiffs respectfully submit they cannot implement Section 7b of the Law due to its unconstitutional vagueness.

## D.    The Potential Harm and Public Interest Factors Support an Injunction.

Plaintiffs satisfy the other prongs of the standard for granting injunction relief, i.e., harm to others and the public interest. Because this action challenges the

constitutional validity of a state statute, the action, by definition, presents issues of public importance. Moreover, given the importance of the temporary staffing industry to the State's economy, and the impact of the Legislation upon temporary service providers and their clients, the public interest is evident. No person or entity can be harmed by enjoining unconstitutional laws causing irreparable harm.

## CONCLUSION

For the foregoing reasons and authorities, it is respectfully submitted that enforcement of the Act be enjoined until this Court decides the merits of Plaintiffs' appeal.

Respectfully submitted,

JAVERBAUM WURGAFT HICKS
KAHN WIKSTROM & SININS, P.C.

/s/ David L. Menzel
DAVID L. MENZEL

/s/ Steven B. Harz
STEVEN B. HARZ

/s/ Rubin M. Sinins
DATED: September 1, 2023          RUBIN M. SININS

## CERTIFICATION OF SERVICE

I hereby certify that I caused a copy of the attached motion to be served on September 1, 2023, by the Notice of Docketing Activity generated by the Third Circuit's electronic filing system, on the following Filing Users:

Nathaniel Levy, Esq.
Nathaniel.Levy@njoag.gov

Jessica L. Palmer, Esq.
Jessica.palmer@law.njoag.gov

Eve Weissman, Esq.
Eve.Weissman@law.njag.gov

Angela Cai, Deputy Solicitor General
angela.cai@njoag.gov

*/s/ David L. Menzel*
DAVID L. MENZEL

DATED:  September 1, 2023

## **CERTIFICATION OF COMPLIANCE**

I hereby certify that this motion contains 4906 words, and therefore does not exceed the 5200-word limit set forth in Fed. R. App. P.27(d)(2)(A).

*/s/ David L. Menzel*
DAVID L. MENZEL

DATED:  September  1, 2023